UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARBUCKLE FUNDING, LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>TALCOTT RESOLUTION LIFE AND ANNUITY INSURANCE COMPANY,<br><br>Defendant. | Civil Action No. 7:23-cv-7972<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Arbuckle Funding, LLC, on behalf of itself and all others similarly situated, for its Class Action Complaint against defendant Talcott Resolution Life and Annuity Insurance Company ("Talcott"), states as follows:

### NATURE OF THE ACTION

1. This is a class action brought on behalf of Plaintiff and similarly situated owners of certain universal life insurance policies insured by Talcott. Plaintiff seeks to represent two classes of Talcott policyholders: one class of policyholders who have been forced to pay unlawful and excessive cost of insurance ("COI") charges by Talcott, and another class of policyholders who have been forced to pay excessive premium tax charges.

2. Universal life policies are variable rate contracts. Unlike term or whole life policies, where premiums are generally fixed and disclosed in advance, universal life policies have separate policy charges that are determined on an ongoing, prospective basis, and those charges—and the

1

rates used to calculate them—are designed to go up or down as the insurer's expectations of future cost factors change. By far the largest charge in a universal life policy is the COI charge, which is calculated on a monthly basis by multiplying the net amount at risk (i.e., the death benefit amount minus the policyholder's account value) by the COI rate, and then deducted from the policyholder's account.

3.  Where permitted by the policy language, COI rates are initially determined on an after-tax basis. That is, the insurer sets COI rates and other charges to generate a certain amount of after-tax profit. Prior to 2018, virtually every insurer used a 35% corporate income tax rate assumption for product pricing.

4.  In late 2017, however, Congress passed the Tax Cuts and Jobs Act (TCJA), which, among other things, reduced the corporate income tax rate from 35% to 21%. This was a boon for life insurance companies like Talcott. Publicly-traded life insurers like Manulife, Protective, Prudential, and Lincoln Financial reported to their shareholders that the TCJA would result in hundreds of millions, and in some cases billions, of dollars in additional profits. The Society of Actuaries (SOA) quickly incorporated the change in its industry tools. For example, in its 2021 update to its Life Pandemic Model: U.S. Life Insurance Industry Moderate Scenario, it changed the assumed tax rate from 35% to 21%.

5.  The passage of the TCJA should have led to a significant reduction in COI rates for Talcott's universal life policies. Under a 35% tax rate, an insurer like Talcott would have to earn pre-tax profits of roughly $154 million to realize an after-tax profit of $100 million. With a 21% tax rate, Talcott needs to generate only $126.6 million in pre-tax profits to produce the same $100

million in after-tax profits. This change alone would indicate that, following the enactment of the TCJA, COI rates should have been reduced by 18%.[1]

6.      Talcott, however, has not reduced COI rates at all following the passage of the TCJA; instead, it has in fact continued to *increase* COI rates according to a pre-TCJA rate scale. This violates the COI rate provision in Plaintiff's policy (and thousands of other Talcott policies), which states:

> **Cost of Insurance Rate…**Rates will be determined *on each Policy Anniversary* based on Our future expectations of such factors as mortality, expenses, interest, persistency and *taxes*. Any change We make will be on a uniform basis for Insureds of the same Issue Age and insurance class and whose coverage has been in force for the same length of time.

7.      This provision requires Talcott to redetermine COI rates annually based on its then-current future expectations of taxes, among other factors. This means that if Talcott's expectations as to future tax liability improve (that is, if it expects future tax liability to decline), COI rates must be adjusted downward to reflect the improvement. Yet, in redetermining COI rates in each of 2019, 2020, 2021, and 2022, Talcott has *ignored* entirely its post-TCJA tax expectations, and kept for its owners—rather than passing along to policyholders—the windfall profits that it is generating as a result of the TCJA.

8.      Talcott's conduct is particularly galling given that life insurers have not hesitated to *increase* COI rates as a result of adverse changes in tax laws. In 1990, Congress passed the Revenue Reconciliation Act of 1990, which changed how insurers, for federal income tax purposes, amortized expenses associated with acquiring new business, and resulted in what insurance companies claimed were an increase in insurer tax liability.[2] Many insurers responded

---

[1] $126.6 million is 82% of $154 million.
[2] These changes are often referred to as the "DAC Tax," or "DAC Tax Reform." "DAC" stands for "deferred acquisition costs."

by increasing COI charges to pass along the increased tax liabilities to policyholders. However, some policyholders and state regulators successfully challenged these rate increases because taxes were not enumerated as a factor on which COI rates could or would be based.

9. As a result of that first wave of COI litigation, and to ensure they could offset the effects of future tax increases, many insurers changed their policy forms to expressly state that COI rates will also be based on taxes. Talcott's policies are paradigmatic: whereas early universal life policies often stated only that COI rates will be determined "based on Our expectations of future mortality experience," Talcott's post-2000 policies, including Plaintiff's, explicitly identify taxes as a factor on which COI rates "will be determined."

10. It is apparent that Talcott wrongly construes its policies as granting it a nonsensical "heads I win, tails you lose" power, reserving the right to *increase* COI rates in response to increasing tax liability, but not requiring it to *decrease* COI rates in the face of an unambiguous and far more dramatic reduction in tax liability that resulted from the TJCA. This interpretation is contrary to the plain language of the policies. As a result of this misconduct, Plaintiff seeks monetary relief for the COI overcharges that Talcott has wrongly imposed on Plaintiff and all of its similarly situated customers who each own policies with the same or materially identical language at issue here.

11. Talcott has also been overcharging Plaintiff and other policyholders in another way. In addition to COI charges, Talcott also imposes premium tax charges, which are designed to cover the premium taxes that Talcott must pay each state (and, in some cases, municipalities) from which it receives a premium payment. Because different states and municipalities can have different premium tax rates, these charges are variable, and are supposed to change if the owner's address

on file with Talcott changes. Plaintiff's policy, which was originally issued in California, states as follows:

| TYPE OF CHARGE | POLICY YEARS | PERCENT OF PREMIUMS PAID |
| --- | --- | --- |
| **DEDUCTIONS FROM PREMIUM PAYMENTS** | | |
| PREMIUM CHARGE | 1 - 20 | 5.00% |
| | 21+ | 2.00% |
| PREMIUM TAX | ALL | 2.35% |

- THE PREMIUM TAX PERCENTAGE RATE DEPENDS UPON THE RATE ASSESSED BY YOUR STATE OR MUNICIPALITY OF RESIDENCE. IF YOUR STATE OR MUNICIPALITY OF RESIDENCE CHANGES AND/OR IF YOUR STATE OR MUNICIPALITY CHANGES ITS PREMIUM TAX RATE, THE PREMIUM TAX RATE WILL CHANGE TO EQUAL THAT NEW RATE.

12. In 2019, Plaintiff, a New York-based limited liability company, acquired the policy from the original policyowner in a secondary market transaction. The change in ownership and address was recorded with Talcott, and ever since then Talcott has sent annual reports and other policy correspondence to Plaintiff's address in Suffern, New York. Talcott, however, has continued assessing a premium tax charge equal to 2.35% of premiums paid (the California premium tax rate), and not New York's much lower 0.7% premium tax rate. Upon information and belief, Talcott has been overcharging hundreds if not thousands of other New York policyholders in the same way. On behalf of itself and all similarly-situated New York policyholders, Plaintiff seeks to recover the premium tax overcharges that Talcott has wrongfully deducted from policyholder accounts, in addition to the COI overcharges described above.

## THE PARTIES

13. Plaintiff Arbuckle Funding LLC ("Arbuckle") is organized under the laws of New York; is headquartered at 1 Executive Blvd, Suite 110, Suffern NY, 10901; and is a citizen of New York. Arbuckle owns a Flexible Premium Adjustable Life Policy, policy number LU2220698, which was issued by Talcott's predecessor Hartford Life and Annuity Insurance Company on

December 15, 2006, and currently has a face value of $250,000 (the "Representative Policy").

14. Defendant Talcott Resolution Life and Annuity Insurance Company, formerly known as Hartford Life and Annuity Insurance Company, is a corporation organized and existing under the laws of Connecticut, having its principal place of business in Windsor, Connecticut. Talcott is licensed to and does transact insurance in New York.

## JURISDICTION AND VENUE

15. This Court has original jurisdiction over Plaintiff's claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action with diversity between at least one class member and one defendant, and the aggregate amount of damages exceeds $5,000,000.

16. This Court has personal jurisdiction over Talcott because Talcott regularly transacts business and issues life insurance in the State of New York, and because one of the two classes alleged in this action consists solely of New York policyholders.

17. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)–(d) because Talcott is deemed to reside in this District and the events giving rise to causes of action for members of both classes occurred in this District, including the issuance of policies in this District and the improper collection of COI rate and premium tax overcharges from persons residing in this District, including Plaintiff.

## FACTUAL BACKGROUND

### A. The COI Overcharge Policies at Issue

18. For the COI overcharge claims, the policies at issue are all flexible-premium, universal life policies issued by Talcott or its predecessors-in-interest stating that COI rates are determined "based on our future expectations of such factors as . . . taxes." These policies are

6

referred to as "COI Overcharge Class Policies." The COI Overcharge Class Policies are all form policies, and owners are not permitted to negotiate different terms. The COI Overcharge Class Policies are all contracts of adhesion.

19. Universal and variable universal life policies ("UL" policies) combine death benefits with a savings or investment component, often known as the "account value" or "accumulated value." One benefit of UL policies is that they permit policyholders flexibility in the amount and timing of premiums necessary to keep the policies in-force. Unlike other kinds of whole life and term life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is deducted from the account value (i.e., the savings component) of the policy every month, so the policyholder forfeits the COI charge entirely to Talcott. Any premiums paid in excess of COI charges and other charges are applied to the account value. These excess premiums earn interest at the credited rate. This structure is beneficial because it allows policyholders to set the savings level within the policy and earn a return that is equal to or exceeds a specified minimum.

20. The size of the COI charge is highly material to universal life policyholders. First, it dictates the minimum amount of money that must be paid to keep a policy in force. Second, high COI rates can quickly diminish account value and reduce the amount of money on which interest can be earned. Absent a secondary guarantee, if the policy value diminishes such that COI charges and certain other specified expenses can no longer be deducted, then the policy will go into grace and, if no additional premiums are paid after adequate time provided by an accurate grace notice, the policy may lapse.

21.     The Representative Policy has the following language defining how the monthly rate– known as the "Cost of Insurance Rate" – used to calculate the COI charge will be determined:

> **Cost of Insurance Rate.** The Cost of Insurance Rate for the Initial Face Amount is based on the current Policy Year as well as the sex, Issue Age and insurance class of the Insured shown on the top of Page 3. The Cost of Insurance Rate for any subsequent Face Amount Increases is based on the number of years that have elapsed since the effective date of the increase as well as the sex, Issue Age and insurance class of the Insured for that increase. The Cost of Insurance Rates for the Initial Face Amount and each subsequent Face Amount Increase will not exceed those in the Table of Monthly Maximum Cost of Insurance Rates shown on Page 3C. We can use Cost of Insurance Rates that are lower than the Monthly Maximum Cost of Insurance Rates shown on Page 3C. <u>Rates will be determined *on each Policy Anniversary* based on Our future expectations of such factors as mortality, expenses, interest, persistency and *taxes*.</u> Any change We make will be on a uniform basis for Insureds of the same Issue Age and insurance class and whose coverage has been in force for the same length of time.

22.     Under this language, if Talcott's expectations of future taxes change for the better (that is, if it expects future tax liability to decline), then COI rates change as well. Talcott cannot simply ignore positive changes to its future expectations, while reserving the right to increase COI rates if negative changes occur.

      **B.**      **Talcott Fails to Reduce COI Rates Despite Benefitting from a Dramatic Decrease in Tax Liability After the Tax Cut and Jobs Act of 2017**

23.     Life insurance policies are typically priced on an after-tax basis, such that COI rates and other charges are, if permitted by contract, calculated to generate a certain level of after-tax profits. Prior to 2018, virtually every "multi-factor"[3] UL policy was priced with an explicit tax assumption that the federal income tax rate would be 35%. Upon information and belief, Talcott priced the Representative Policy and all other COI Overcharge Class Policies with an assumption that the corporate tax rate would remain at 35%.

---

[3] A "multi-factor" policy is a policy that identifies numerous cost factors on which COI rates are based, such as mortality, investment earnings, persistency, expenses, and taxes. A "single-factor" policy is a policy that identifies only one factor on which COI rates will be based—generally mortality. The COI Overcharge Class Policies are all multi-factor policies.

8

24. In 2017, the corporate tax rate was dramatically reduced from 35% to 21%. This was a boon for life insurers like Talcott. Prudential, for example, recognized a $2.88 billion tax benefit in its Consolidated Statements of Operations for the year ended December 31, 2017. Protective Life recognized a provisional $797.6 million tax benefit in its consolidated statement of income for the year ended December 31, 2017. Manulife, which owns U.S.-based life insurers John Hancock Life Insurance Company (U.S.A.) and John Hancock Life Insurance Company of New York, reported in 2018 that the expected impact of the TCJA "is an expected ongoing benefit to net income attributed to shareholders and core earnings of approximately $240 million per year commencing in 2018."

25. The terms of the Representative Policy require that Talcott pass along those future tax reductions to policyholders via a COI decrease. Indeed, that is the entire purpose of variable rate contracts like universal life: if future expectations change for the worse, rates can go up if consistent with the language of the policies; if future expectations change for the better, rates must come down. But Talcott has simply ignored its vastly improved tax expectations and left its pre-TCJA rate scale in place, in plain breach of its promise that actual COI rates would be determined "on each Policy Anniversary" (i.e., on an annual basis) "based on [its] future expectations of . . . taxes."

26. It is impossible for any alleged deterioration in Talcott's expectations for non-tax cost factors (e.g., mortality, expenses, interest, and persistency) to have offset the positive impact of the TCJA. The change in corporate tax rate alone implies that, for a profitable block of universal life policies, COI rates should be reduced by roughly 18%.[4] And, because Talcott is required to

---

[4] In addition to the change in corporate tax rates, there were some other changes in the TCJA that also impact the taxation of universal life. The extent to which those changes impact a specific product or block of policies depends on how those policies were priced, the level of premiums paid by the policyowner, and what duration they were in. The

determine COI rates annually, COI rates had last been determined, using Talcott's then-current expectations of mortality, expenses, interest, and persistency, less than a year before the enactment of TCJA. It is wholly implausible that Talcott's mortality, expenses, interest, and persistency expectations, for example, suddenly deteriorated in 2017 at the exact same time as the TCJA was enacted, and offset entirely—and exactly—the dramatic reduction in corporate tax rates.

27.     Moreover, mortality is generally the most significant component of COI rates, and it—like corporate income tax rates—has only improved since the Representative Policy was issued. Beginning at least in 1941, the National Association of Insurance Commissioners ("NAIC") has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that insurers use to calculate reserves and to set maximum permitted COI rates in UL policies. The IRS also uses the CSO tables to define what constitutes "life insurance," what constitutes a "reasonable mortality charge," and what is deductible for federal tax purposes.

28.     The 2001 CSO Mortality Table was the most recent CSO mortality table at the time the Representative Policy was issued. Since that table was introduced, the SOA has continued to survey the death rates that large life insurance companies actually observe among their policyholders, in the process of analyzing expectations of future mortality experience. These surveys have consistently showed mortality improvement since 2001. For example, the SOA published Individual Life Experience Reports for the periods 2005-2007, 2008-2009, and 2009-

---

actuarial consulting firm Milliman Inc. issued a white paper and concluded that, for *new* policies issued after TCJA took effect, COI rates on new policies should be set at least 8% lower than they were pre-TCJA. Regardless of whether TCJA necessitated an 18% reduction in COI rates, or closer to an 8% reduction, the impact was highly material and could not possibly have been offset by deterioration in any other expectations.

2016, each of which noted strong rates of improvement in mortality. Another SOA study called the Mortality Improvement Survey Report confirms that conclusion.

29.     Periodically the SOA will publish an updated table to reflect the evolving industry experience. Some major updates include the 2008 Valuation Basic Table and the 2015 Valuation Basic Table. Each of these updates confirms that mortality has continued to significantly improve since the 2001 CSO Table. Other surveys have also noted mortality improvements. In May 2013, for example, the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rates and mortality improvements at older ages, which showed material rates of mortality improvements. In 2018, ITM, a life expectancy service, released a report showing continued mortality improvement. These improvements have resulted in lower costs to insurers, which, like lower tax rates, should be passed on to policyholders through lower COI charges.

30.     At a minimum, there was nothing that occurred in 2017 that would have resulted in an upward revision of Talcott's mortality expectations or offset the future benefits of the TCJA. COVID-19 did not emerge until 2020, and the increase in mortality resulting from that was (a) relatively small in historical terms, (b) generally viewed by the industry as transitory, with insurers still projecting future mortality improvement to continue.

31.     Indeed, Talcott has itself acknowledged that there were no adverse changes in mortality or any other anticipated experience factor. Each year, insurers must file annual interrogatory statements with the NAIC. These are sworn statements that are certified and signed by an actuary. The interrogatories include questions regarding the determination of non-guaranteed elements (which include COI rates) and whether expectations have changed. For example, Question 4 asks: "Are the anticipated experience factors underlying any nonguaranteed elements [e.g., COI rates] different from current experience?" In each of 2015, 2016, 2017, 2018, 2019,

2020, and 2021, Talcott answered "No." This confirms that neither mortality nor any other anticipated experience factor had deteriorated, let alone to such a degree that it would offset the positive impact of the TCJA.

### C. Talcott's Breach of Policies by Charging Excessive and Incorrect Premium Tax Rates

32. Talcott assesses an additional charge on each premium payment to recoup another type of tax: state level premium taxes.

33. State premium taxes work like sales taxes on insurance companies, with different states charging different rates. The applicable tax rate depends on the state where the owner lives when each premium is paid, as determined by the owner's mailing address as shown in the companies' records. Talcott passes this cost on to consumers in the form of a premium tax charge, but it promises that "if your state or municipality of residence changes and/or if your state or municipality changes its premium tax rate, *the premium tax rate will change to equal that new rate*."

34. Under this policy language, if a policyholder moves to a state with a lower premium tax rate, Talcott must reduce the premium tax charge it levies against the policyholder to reflect the lower rate.

35. Talcott is acutely aware of when its policyholders move to different states. Insurers typically track the residence of the owners of their policies in their administrative systems, whether at issuance or in the future. New owners must submit "change of ownership" forms to Talcott in order for a transfer to take effect. Talcott must also keep accurate address information so that it can send annually required statements and other correspondence to policyholders.

36. Talcott has not kept its promise to policyholders. The Representative Policy is illustrative: that policy was originally issued in California but was later acquired by the New York-

based Arbuckle. Talcott confirmed the change in ownership, switched the address on file to 1 Executive Blvd, Suffern NY 10901, and began sending annual statements and other correspondence to New York instead of California. Yet, despite knowing that the policyholder had moved from California to New York, Talcott has nonetheless continued to charge Plaintiff a premium tax rate of 2.35% (the California premium tax rate) rather than 0.7% (the New York premium tax rate). That is, Talcott is collecting from each premium payment a charge that is 1.65% higher than it should have. Talcott engages in the same practice with other similarly situated New York policyholders as well, in clear breach of policy terms.

## CLASS ACTION ALLEGATIONS

37.     This action is brought by Plaintiff individually and on behalf of two classes pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure. The first class, referred to as the "COI Overcharge Class" consists of:

> All current and former owners of universal life (including variable universal life) insurance policies issued or insured by Talcott Resolution Life and Annuity Insurance Company and its predecessors in interest that state that cost of insurance rates will be determined based on future expectations that includes taxes.

38.     Plaintiff seeks to represent a second class of policyholders, referred to as the "Premium Tax Overcharge Class." The Premium Tax Overcharge Class consists of:

> All current and former owners of insurance policies issued or insured by Talcott Resolution Life and Annuity Insurance Company and its predecessors in interest that (a) own policies with language guaranteeing that, in the event the policyholder changes state of residency, Talcott will change the premium tax rate it charges to equal the new rate, (b) had a New York address registered with Talcott, and (c) were being assessed a premium tax rate in excess of 0.7% during the time that the New York address was registered with Talcott.

39.     Plaintiff reserves the right to seek certification of subclasses, or alternative classes, by original issuing company, product, state of issue, or dates of ownership.

40. The COI Overcharge Class and the Premium Tax Overcharge Class consist of hundreds or thousands of consumers of life insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by Talcott.

41. The claims asserted by Plaintiff are typical of the claims of the COI Overcharge Class and Premium Tax Overcharge Class.

42. Plaintiff will fairly and adequately protect the interests of the classes and does not have any interests antagonistic to those of the other members of those classes.

43. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

44. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any classes certified in this action.

45. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting both classes predominate over any individualized issues. Those common questions that predominate include:

(a) the construction and interpretation of the form insurance policies at issue in this litigation;

(b) whether Talcott's actions in failing to decrease the cost of insurance charges imposed on the COI Overcharge Class violated the terms of those form policies;

(c) whether Talcott breached the policy provision stating that "[r]ates will be determined based on Our future expectations of such factors as . . . taxes";

(d) whether Talcott "determined" rates "on each Policy anniversary";

(e) whether Talcott failed to adjust the premium tax rates it levied on policyholders that had moved to New York from states with higher premium tax rates;

(f) whether Talcott breached its contracts with Plaintiff and members of the Premium Tax Overcharge class; and

(g) whether Plaintiff and members of the proposed COI Overcharge Class and Premium Tax Overcharge Class are entitled to receive damages as a result of the unlawful conduct by defendant as alleged herein and the methodology for calculating those damages.

46. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) the complexity of issues involved in this action and the expense of litigating the claims means that few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when Talcott's liability has been adjudicated, claims of all class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and Talcott's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract on Behalf of Plaintiff and the COI Overcharge Class

47. Plaintiff realleges and incorporates the allegations of paragraphs 1–46 of this complaint as if fully set forth herein.

48. The COI Overcharge Class Policies are binding and enforceable contracts.

49. Talcott breached its contracts with Plaintiff and the COI Overcharge Class by failing to determine COI rates "on each Policy Anniversary" based on future expectations of taxes and deducting COI charges calculated based on those unlawful rates. Plaintiff's and the COI Overcharge Class's damages include, but are not limited to, the excess COI charges that Talcott deducted by not determining COI rates based on improved future tax expectations.

50. Talcott's failure also breaches the covenant of good faith and fair dealing that is implied by law in all contracts.

51. Plaintiff and the COI Overcharge Class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Talcott's conduct as set forth herein.

52. As a direct and proximate cause of Talcott's material breaches of the policies, Plaintiff and the COI Overcharge Class have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### Breach of Contract on Behalf of Plaintiff and the Premium Tax Overcharge Class

53. Plaintiff realleges and incorporates the allegations of paragraphs 1–46 of this complaint as if fully set forth herein.

54. The Premium Tax Overcharge Class Policies are binding and enforceable contracts.

55. Talcott breached its contracts with Plaintiff and the Premium Tax Overcharge Class by failing to adjust premium tax rates for policyholders that moved to New York from states with higher premium tax rates and charging premium tax rates in excess of New York's premium tax rate. Plaintiff and the Premium Tax Overcharge Class's damages include, but are not limited to, the excess premium tax charges that Talcott deducted in excess of New York's premium tax rate of 0.7%.

56. Talcott's failure also breaches the covenant of good faith and fair dealing that is implied by law in all contracts.

57. Plaintiff and the Premium Tax Overcharge Class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Talcott's conduct as set forth herein.

58. As a direct and proximate cause of Talcott's material breaches of the policies, Plaintiff and the Premium Tax Overcharge Class have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the COI Overcharge Class, and the Premium Tax Overcharge Class pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiff, the COI Overcharge Class, and the Premium Tax Overcharge Class compensatory damages;

3. Awarding Plaintiff, the COI Overcharge Class, and the Premium Tax Overcharge Class pre-judgment and post-judgment interest, as well as any costs and attorneys' fees allowed by law; and

4. Awarding Plaintiff, the COI Overcharge Class, and the Premium Tax Overcharge Class such other relief as this Court may deem just and proper under the circumstances, including without limitation reinstatement and other equitable relief for policies that lapsed or were surrendered after Talcott's breach.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the class hereby demand a trial by jury as to all issues so triable.

Dated:  September 8, 2023               Respectfully submitted,

*/s/ Ryan C. Kirkpatrick*
Seth Ard
Ryan C. Kirkpatrick
Zachary B. Savage
Daniel D. Duhaime
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
Telephone: 212-336-8330
Facsimile: 212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com
zsavage@susmangodfrey.com
dduhaime@susmangodfrey.com


Steven G. Sklaver (*pro hac vice* to be filed)
Glenn C. Bridgman (*pro hac vice* to be filed)
Kim Page (*pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.

                                1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: 310-789-3100
Facsimile: 310-789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
kpage@susmangodfrey.com

*Attorneys for Plaintiff*